UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JERRI WEGMANN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:11 CV 2185 JAR/DDN |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Jerri Wegmann for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. § 401, et seq. The action was referred to the undersigned Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the decision of the Commissioner be affirmed.

## I. BACKGROUND

Plaintiff Jerri Wegmann, who was born in 1968, applied for Title II disability benefits on August 18, 2009. (Tr. 127.) She alleged an onset date of disability of October 15, 2008. (Tr. 149.) Her alleged disabling impairments are depression, anxiety disorder, post-traumatic stress disorder, asthma, fibromyalgia, tendonitis, plantar fasciitis, osteoarthritis, and scoliosis. (Tr. 153.) Plaintiff's applications were denied initially on May 12, 2010, and she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 75-78, 80-81.) The hearing took place on March 1, 2011. (Tr. 25-65.)

On March 9, 2011, following the hearing, the ALJ found plaintiff was not disabled within the meaning of the Act from October 15, 2008 through the date of the decision. (Tr. 8-24.) On October 19, 2011, the Appeals Council denied plaintiff's request for review. (Tr. 1-5.) Thus, the decision of the ALJ stands as the final decision of the Commissioner. (Tr. 11-20, 1-5.)

## II. MEDICAL HISTORY

From July 2009 through September 2010, plaintiff's primary care physician, Robert Oliver, M.D., saw her several times. Clinical impressions included asthma/chronic obstructive pulmonary disease (COPD), degenerative joint disease, anxiety, tobacco abuse, intestinal ulcers, and gastroesophageal reflux disease. Headaches began after a bump on the head in approximately June 2010. (Tr. 452-73.)

On August 26, 2009, psychologist Robert Hendricks, M.S., evaluated plaintiff. His notes explain that plaintiff "relates a life replete with misfortune, and almost never-ending suffering and misery," with minor and major physical problems. He also mentions twice his belief that she will "not always be 100% reliable" in taking her medications as prescribed. Dr. Hendricks diagnosed general anxiety disorder (GAD) and major depressive disorder (MDD). (Tr. 282.)

On September 21, 2009, plaintiff was examined at St. John's Mercy Medical Center for pain in her neck, shoulder, back, left foot, right hand, and general osteoarthritis. Behrad Majidi, M.D. prescribed Cyclobenzaprine for spasms and Propoxyphene for pain. The examination revealed that plaintiff was tender on the left side of her neck, but that she had no limitation in her range of motion. (Tr. 295-96.)

On September 29, 2009, plaintiff saw Farhat Shereen, M.D., for pain in her back, hands, and feet. She underwent X-rays of her hands, knees, feet, and spine. The X-rays failed to account for the pain in either hand. The X-ray report suggested anterior ankle impingement in the left foot and a tiny plantar calcaneal spur on the right foot.[1] (Tr. 445-51.)

On October 14, 2009, plaintiff saw Dr. Shereen again for neck pain, myalgia, and fatigue. He found plaintiff symptomatic for osteoarthritis, fibromyalgia, and arthropathy of the ankle and foot.[2] He recommended physical therapy and taking Cyclobenzaprine as needed. (Tr. 428-29.)

On October 16, 2009, plaintiff sought treatment for pain in her feet from Sophie Liu, DPM. Plaintiff told Dr. Liu that her pain was at level 8 out of 10, and that it had

---

[1] A calcaneal spur, or heel spur, is bony thickening of the flexor surface of the calcaneus associated with severe pain on standing. Stedman's Medical Dictionary 382750 (27th Ed. 2000)(Westlaw).

[2] Arthropathy is any disease affecting a joint. Stedman's at 33390.

been present for years, though plaintiff admitted that she walked barefoot at home and stood for prolonged periods of time. Dr. Liu assessed compensatory peroneal tendonitis/tarsitis with underlying plantar fasciitis with associated retrocalcaneal bursitis and gastrocnemius equinus contracture.[3] Her treatment did not include medication; it consisted of supportive shoes, refraining from barefoot walking, using an ice pack and arch supports, and calf muscle stretching. After a follow-up on November 9, Dr. Liu did not alter plaintiff's treatment plan. (Tr. 286-87.)

On November 17, 2009, Dr. Shereen found plaintiff symptomatic of fibromyalgia syndrome and cervicalgia (neck pain). He "reiterated the need for regular aerobic activity," and stressed to plaintiff that narcotics are not the recommended prescription for fibromyalgia. He also recommended physical therapy. (Tr. 426-27.)

On December 8, 2009, Rolando Larice, M.D. diagnosed plaintiff with GAD, MDD, and post-traumatic stress disorder (PTSD). He prescribed her Xanax and Prozac. (Tr. 318-27.)

On March 5, 2010, plaintiff saw Dr. Punita Gupta, M.D. for ankle pain on Dr. Shereen's referral. Dr. Gupta detected no joint effusion or acute fracture. He did see a "tiny plantar calcaneal spur." On March 15, another MRI of plaintiff's right ankle revealed chondrosis and cartilage loss consistent with posterior impingement. On April 21, plaintiff underwent yet another MRI of her left ankle. The impression was a stress reaction involving the talar neck and talar breaking consistent with posterior ankle impingement syndrome[4] and moderate to severe osteoarthritic changes. (Tr. 442-444, 357.)

---

[3] Plantar fasciitis is inflammation of the plantar fascia causing foot or heel pain. Stedman's at 145720.

Bursitis is inflammation of a bursa. A bursa is a closed sac or envelope lined with synovial membrane and containing fluid, usually found or formed in areas subject to friction. Stedman's at 58320.

Contracture is static muscle shortening due to tonic spasm or fibrosis, to loss of muscular balance, paralysis of the antagonists, or to a loss of motion of the adjacent joint. Stedman's at 89800.

[4] Impingement syndrome is pain on elevation of the joint due to pressure of an injured or inflamed tendon or inflamed bursa coming into contact or pressing on the overlying process. Stedman's at 397030 (27th Ed. 2000).

On March 29, 2010, Mark K. Keohane, M.D., saw plaintiff for pain in her right ankle. Dr. Keohane reported cartilage loss in the posterior tibiotalar joint with impingement and suspected osteoarthritis. He specifically did not think her problems required operative care at this point. He recommended a brace and more appropriate footwear. (Tr. 487.)

On April 2, 2010, plaintiff saw Dr. Larice again. He again diagnosed GAD, MDD, and PTSD. He wrote that plaintiff had no mental problem impacting her ability to perform basic tasks and make decisions required for daily living. She had no restriction in daily activities nor difficulty in social functioning. She exhibited slight depression over her orthopedic condition. (Tr. 328-30.)

On April 29, 2010, Ricardo Moreno, Ph.D., conducted a psychiatric review. He noted that her impairments, including affective and anxiety-related disorders, were not severe. He confirmed Dr. Larice's diagnoses. He further marked that plaintiff suffered no restriction of activities of daily living or repeated episodes of decompensation, and considered "mild" her limitations maintaining social functioning and concentration. (Tr. 331, 339.)

On May 3, 2010, Dr. Keohane saw plaintiff regarding her left ankle. Dr. Keohane stated that the motion in both ankles was decreased by about 50%. He recommended customized shoe inserts, seeing a different rheumatologist, and again being "very cautious" regarding operative care, for he felt surgery would not adequately reduce plaintiff's pain. (Tr. 485.)

On May 5, 2010, plaintiff underwent a consultative examination by Arjun Bhattacharya, M.D., at the request of the Missouri state Disability Determinations office. He confirmed Dr. Shereen's impressions of posterior ankle impingement syndrome and moderate to severe osteoarthritic changes. He determined that plaintiff was able to walk about five blocks, stand for 10 to 15 minutes, sit for 30 minutes without changing position, and lift five pounds. She is capable of light housework but does not do any heavy lifting. Dr. Bhattacharya also mentioned her asthma diagnosis and shortness of breath. Plaintiff is taking 24 medications, all but one of them at least once daily. He discovered "some stiffness with decreased range of movement" in plaintiff's neck and back, as well as pain in both ankles and her right wrist. He ultimately advised that plaintiff has low back spasms with decreased range of movement, bronchial asthma, and ankle impingement syndrome. He wrote that a cane

is medically necessary "for distances greater than 100 feet and unfamiliar, uneven terrain." (Tr. 341-47.)

On May 12, 2010, plaintiff received MRIs of both ankles by Amod P. Paranjpe, DPM. He stated that the MRI shows breaking of the talar neck, a fibrous calcaneonavicular coalition on the left foot, and degenerative changes on the left foot. On the right, he noted posterior impingement of the tibiotalar joint. The podiatrist disagreed with Dr. Keohane regarding plaintiff's treatment, and felt that she would be well-served to undergo surgery, a restriction of her calcaneonavicular bar, which he later performed himself. (Tr. 484-85.)

On May 20, 2010, Dr. Keohane examined and X-rayed plaintiff's knees. He reported: "There is . . . no effusion. Knees are stable. Range of motion is 0-135 degrees. There is some retro patellar crepitation. Plain X-rays of her knees are unremarkable . . . I don't think this patient needs operative care. She however was interested in MRI which I did not think was unreasonable." (Tr. 486, 488.)

On May 26, 2010, plaintiff's knees were again examined by Keith Kastelic, M.D. On the right knee, he noted "small-moderate joint effusion . . . within the suprapatellar bursa and chondromalacia patella," but that the "menisci and articular cartilage are intact," and further that "medial and collateral ligaments are intact.[5] The infra and suprapatellar tendons are unremarkable. No evidence of a fracture or other significant osseous abnormality." On the left knee, his impression was mild chondromalacia patella and small ganglion cysts, but all surrounding ligaments and tendons were intact. (Tr. 362-63.)

On June 18, 2010, plaintiff underwent an operation to restrict the left calcaneonavicular bar in her ankle by Dr. Paranjpe. She underwent two follow-up procedures to address complications in the healing process, which Dr. Paranjpe said were due to unsound practices from a wound care center. The center packed her wound with a drain which exacerbated pain and scarring and "unfortunately resulted in a keloid scar."[6] The later procedures removed an ulcer and the keloid. (Tr. 490-91.)

---

[5] Chondromalacia is a softening of cartilage. Stedman's at 77260 (27th Ed. 2000).

[6] A keloid is " A nodular, firm, movable, nonencapsulated, often linear mass of hyperplastic scar tissue, tender and frequently painful, consisting of wide irregularly
(continued...)

On July 14, 2010, X-rays of her left foot at St. Charles Orthopaedic showed "no sign of fracture" and "good alignment and healing." Plaintiff received X-rays of the same foot again on July 27. "Radiographically there [were] no changes." Her incision, however, was not healed, and she continued to express pain. Dr. Paranjpe wrote, "I don't have an exact reason for her symptoms at this time. Clinically she appears to be doing well. She does not exhibit any signs of neuropraxia [sic] or neuralgia per say [sic]."[7] (Tr. 483, 488.)

Plaintiff saw Dr. Paranjpe on August 5, 2010 for an MRI of her left ankle. His impression was soft tissue edema in the area of surgery, degenerative changes, and postoperative inflammation. (Tr. 492.)

Plaintiff saw Dr. Paranjpe again on August 11, 2010 out of concern that her pain was getting worse. He recommended lighter packing on the wound, and to consult the wound care center on better treatment. She stated to him that she had an infection at the wound site. He informed her that her wound was not infected. (Tr. 483.)

On August 19, 2010, plaintiff had an ulcer formed at the surgical site removed to improve the healing process. (Tr. 490.)

On September 1, 2010, Dr. Paranjpe found plaintiff's wound nearly healed. She complained of a long-running fever; he directed her to see her primary care physician for that. On September 15, her wound was completely healed, though she continued to express pain. (Tr. 481.)

On October 13, 2010, plaintiff saw Dr. Paranjpe for compensatory pain in her forefoot, which he wrote "is consistent with [a] neuroma." Dr. Paranjpe gave her a cortisone injection for her symptoms, and sent her to physical therapy "for gradual return to activities". (Tr. 480.)

---

[6](...continued)
distributed bands of collagen; occurs in the dermis and adjacent subcutaneous tissue, usually after trauma, surgery, a burn, or severe cutaneous disease . . ." Stedman's at 216510 (27th Ed. 2000).

[7] The correct spelling is "neurapraxia," and this condition is the mildest type of focal nerve lesion that produces clinical deficits; localized loss of conduction along a nerve without axon degeneration; caused by a focal lesion, and followed by a complete recovery. Stedman's 271430 (27th Ed. 2000).

On November 10, 2010, plaintiff consulted Dr. Paranjpe for keloid at the area of ulceration. He prescribed a cortisone cream and pain pills, but also advised her to continue physical therapy. (Id.)

On December 1, plaintiff returned because of continued pain at the site of the keloid scar. Dr. Paranjpe administered a cortisone injection. (Id.)

Walter Clayton Davis, MA, LPC, saw plaintiff on December 27, 2010 for a mental impairment questionnaire. He also diagnosed major depression, anxiety disorder, and PTSD. He felt that employment "would not be considered appropriate . . . at this time." Plaintiff's symptoms included sleep disturbance, mood disturbance, social withdrawal or isolation, decreased energy, intrusive recollections of a traumatic experience, and generalized persistent anxiety. Mr. Davis gave plaintiff a poor prognosis, and expected her impairment to last at least twelve months. Unlike the diagnosis of Dr. Moreno, Dr. Davis felt that plaintiff experienced continual episodes of decompensation. He felt that her impairments or treatment would cause her to be absent at least three times monthly, that she has marked restriction of daily living activities, marked difficulties maintaining social functioning, and frequent deficiencies in concentration. (Tr. 411-421.)

On December 30, 2010, plaintiff received a steroid injection for one of her two suspected neuromas. (Tr. 479.)

Anthony Guarino, M.D., conducted an initial evaluation of the plaintiff on January 5, 2011 at Dr. Paranjpe's request. Dr. Guarino conducted his own physical evaluation as well as reviewing plaintiff's medical history. His impression was of peripheral neuropathy, fibromyalgia, and osteoarthritis.[8] He stated that use of narcotics may be reasonable, despite her other doctors' discomfort continuing her on narcotic treatment. (Tr. 475-77.)

---

[8] Neuropathy is a general term for a disease affecting the nervous system, in this case the peripheral nervous system. Stedman's 272690.

Fibromyalgia is a syndrome of chronic pain of musculoskeletal origin but uncertain cause. The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution; additionally there must be point tenderness in at least 11 of 18 specified sites. Id. 148730 (27th Ed. 2000).

Plaintiff's keloid was removed on January 7, 2011, and her sutures were removed January 26. (Tr. 489.)

As of January 19, 2011, plaintiff was taking 20 daily medications.[9] (Tr. 238.)

As of February 28, 2011, Dr. Guarino was also prescribing plaintiff Vicoden (4 per day) and 30 mg of morphine every 8 hours. Dr. Harry Burback also added to her daily regimen Trimethobenzmide, Dicyclomine, Nexium, and Fibercon for a total of 26 medications. (Tr. 239.)

**Testimony at the Hearing**

On March 1, 2011, a hearing was conducted before an ALJ. Plaintiff was 42 at the time. She was single and living with her sister, mother, adult daughter, and two young sons. She completed the eleventh grade but did not earn a GED. She received a Medical Assistant's certificate from Allied Medical College, but never registered due to a traumatic experience during her internship. Plaintiff testified that while drawing a patient's blood, she got stuck with a needle and later found out that the patient "just had brain cancer and was HIV positive." (Tr. 33-34, 48-49.)

Plaintiff suffers from PTSD as a result of this experience. She is also plagued by frequent anxiety attacks and depression. She has had extreme difficulty keeping a job since 2004. In 2008, she was employed at Cracker Barrel less than a year, but testified that "the physical demands of being one-on-one with people" overwhelmed her to the point of panic attacks. She was granted extended medical leave, but when she realized she couldn't "get a grip on the issues," she was dismissed. Before that, she worked as a bartender at a casino for about three months, but testified that the "one-on-one contact with the alcoholics" brought her to tears because she was brought up "in a very abusive and alcoholic family." (Tr. 33-36.)

Before that, plaintiff worked at a Bob Evans restaurant, but her arthritis and "the functions with [her] back, feet, [and] neck really started to kick in." She continued

---

[9]From Dr. Larice: Hydroxyzine Pamoate, Trazodone, Singular, Seroquel, Bupropion, Cymbalta, Alprazolam.
From Drs. Oliver and Rodriguez: Fluticasone Nasal, Butalbital, Ventolin, Flovent.
From Dr. Oliver: Simethicone, Prilosec, Ranitidine, Lansoprazole. The latter three are over the counter only because plaintiff's insurance did not cover them.
From Dr. Paranjpe: Hydrocodone, Triamcinolone, Ibuprofen.
From Dr. Shereen: Cyclobenzaprine, Vitamin D.

to work for a few hours on Sundays only, but ultimately quit or was dismissed from there as well. Plaintiff worked two to three months as a supervisor at Molly Maids, but "couldn't handle the physical strain." Once, her pain was so intense she was sent to an urgent care center. She was dismissed from that work shortly afterward because "[t]hey were afraid of workers' compensation suits." (Tr. 36-37.)

She worked at the Ground Round steakhouse in 2003 and 2004, but was fired "due to a misunderstanding with the computer systems;" she claimed she was falsely accused of giving away free meals. She worked at Synergistic, a company that makes surgical instruments, assisting engineers. She held this position up to a year, but eventually couldn't handle the pain in her neck and back caused by sitting and looking into a microscope all day. (Tr. 38-40.)

She worked as a cashier at a gas station. She quit after less than a year because she couldn't lifting the soda and the beer. She worked at another gas station for over a year, but quit because of anxiety. (Tr. 40-41.)

In 1997, she held a customer service position for Nokia, but left after a few months because of the "stress of dealing with people" and because she grew uncomfortable sitting for extended periods of time. (Tr. 41.)

Plaintiff testified "I keep running into the same thing. I go in, I get stressed out, I get in an argument with somebody, lose my temper, end up in tears and don't go back. I just don't go back." Both pain and dealing with people are her current barriers to employment. (Tr. 38, 41-42.)

Physically, plaintiff testified she is in constant pain which increased throughout the day. She had degenerative osteoarthritis in all joints, cartilage loss in her knees and neck, migraines, and fibromyalgia. Her foot pain is due to congenital structural problems; she had undergone foot surgery and two post-surgical procedures in 2010. The only food she is able to keep down is unhealthy food, and she has irritable bowel syndrome, gastroesophageal reflux disease (GERD), and ulcerative colitis. Plaintiff further stated, "I don't do well in therapy because I know they are judging me and don't believe anything I am saying to them . . ." (Tr. 30-32, 42-44.)

Both sitting and standing is painful, and as a result, most of her day is spent lying in bed, adjusting pillows and blankets. She has a straightening of the spine which prevents her from sitting properly at a desk. Cartilage loss in her knee makes it painful to sit with her knees bent. She can walk her son to the bus stop, cook dinner three

nights a week, do laundry, sweep, be a leader for her son's Cub Scout den, and shower her children every night, though most of these activities are painful. She had her 22-year-old daughter move back in with her "for moral support," because she was afraid of her inability to help her sons if there was an emergency. (Tr. 47, 49, 54-55.)

She also has tremors in her hands, and she cannot lift a full gallon of milk.

She testified she has memory loss so extreme that she will forget to brush her teeth or go to the bathroom. She constantly makes lists to keep track of things. Her difficulty helping her five-year old son with basic addition and subtraction problems is due to memory loss, though she states elsewhere that only her short term memory is affected. She cannot read a book because of difficulty concentrating. (Tr. 48-50.)

Plaintiff's pain and her medications, many of which she takes for pain, may contribute to her anxiety and inability to deal with people. For example, when she goes to Wal-Mart and it is too crowded, she begins to hyperventilate and her sons have to calm her down. "[D]ealing with people has become a vicious circle [sic] to where things that should be a normal daily activity, I blow out of proportion . . . I want nothing to do with men or with women either for that matter. But basically men." She hates it when her mother gives her instructions because she feels she is being treated like a three-year old, "so then I start arguing like a three-year-old and then have to come back later and apologize." (Tr. 51-53.)

Vocational expert (VE) Gary Wingholt testified at the hearing. He testified that plaintiff's past work experience at Synergistic falls under a "quality control inspector" position, which is sedentary and semi-skilled; a cashier position is light and semi-skilled; a waitress position is light and semi-skilled; a stock clerk position is heavy and semi-skilled; a housekeeper position is light and unskilled. (Tr. 61.)

The VE responded to a hypothetical question posed by the ALJ using plaintiff's age, education, and work experience. This hypothetical individual was restricted to sedentary work with a sit-stand option every twenty minutes, had only occasional contact with supervisors and coworkers, and had no transactional interaction with the public. (Id.) The VE testified that with the limits posed by the ALJ, plaintiff could not perform his past work. However, the plaintiff could perform other light jobs with sit-stand options. These jobs include pharmaceutical packaging, document imaging, or other unskilled jobs relating to plastic products or eyewear.

The ALJ then submitted a hypothetical question adding to the previous question a lie-down option for ten minutes every hour. The VE responded, "No, that would be incompatible with employment." (Tr. 62-63.)

## IV. DECISION OF THE ALJ

On March 9, 2011, the ALJ issued a decision that plaintiff was not disabled. (Tr. 8-24.) At Step One of the prescribed regulatory decision-making scheme,[10] the ALJ determined that plaintiff was not engaged in substantial gainful activity. At Step Two, the ALJ determined that plaintiff had severe impairments; ankle arthritis, asthma, and fibromyalgia. Plaintiff's depression was considered non-severe. (Tr. 13.)

In determining whether plaintiff's depression was severe or not, the ALJ considered plaintiff's functional abilities in daily living, social functioning, "concentration persistence or pace," and decompensation. In all of these categories, depression was either a mild limitation or not a limitation at all. She still drove, cooked, swept, wrote poetry, and got along with her family. (Tr. 14.)

At Step Three, the ALJ determined that even in combination, the plaintiff's impairments did not meet or medically equal one of the listed impairments in C.F.R. part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, and 404.1526).

At Step Four, the ALJ determined that plaintiff cannot perform her past relevant work, but that she has the residual functional capacity (RFC) to perform sedentary work with a sit/stand option every 45 minutes while remaining on task.

At Step Five, the ALJ identified jobs in sufficient numbers in the national economy fitted to plaintiff's RFC. The vocational expert testified that positions allowing for such accommodations exist not only in the national economy but the Missouri economy in significant numbers. His testimony was accepted, and therefore the ALJ found that plaintiff's impairments would not preclude her from performing work in the national economy.

Thus, plaintiff was not disabled. (Tr. 20.)

---

[10]See below for a description of the required five-step regulatory decisionmaking framework.

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V. DISCUSSION

Plaintiff argues the ALJ erred in (1) failing to properly consider 20 C,F,R, Part 404, Subpart P, Appendix 1, Listing of Impairments, Listings 1.02 and 1.03; and (2) failing to properly consider the combination of all of plaintiff's severe medically determinable impairments.

### A. Requirements of Listing Sections 1.02 and 1.03

Plaintiff argues that she meets Listings 1.02 and 1.03 under the Musculoskeletal Category of Impairments due to her inability to walk effectively, thereby satisfying the requirements of Step Three. The ALJ decided that plaintiff has degenerative joint disease, "but no significant limitation in range of motion, motor loss, atrophy, or sensory or reflex loss." (Tr. 15.) Plaintiff argues that this is inaccurate, citing other diagnoses: anterior ankle impingement and contracture, both of which limit range of motion, plantar fasciitis, and osteoarthritis.

Plaintiff argues that two doctors observed that the range of movement in her ankles was restricted by 50-75%, and that the ALJ should have considered these figures "significant" enough to meet the requirements of Listings 1.02 or 1.03. Dr. Bhattacharya, whose testimony was considered by the ALJ, wrote that a cane is medically necessary for distances greater than 100 feet and for unfamiliar terrain. Plaintiff further argues that the ALJ's estimation that her recovery from three ankle surgeries would not last a continuous 12-month period is baseless because she still walked with a cane nine months after the original surgery.

The ALJ acknowledged plaintiff's severe impairments, including ankle arthritis, asthma, and fibromyalgia, but considered plaintiff's depression non-severe. These impairments, the ALJ determined, did not result in "anatomical deformity of inability to ambulate effectively."

This determination is supported by substantial evidence. (Tr. 15.) The ALJ noted that plaintiff was capable of sweeping, dusting, shopping for groceries, doing laundry, and being a leader for her son's Cub Scout den, which required moderate physical activity. (Tr. 54-55.) Listings 1.02 and 1.03 require that the inability to walk effectively must last or be expected to last at least twelve months. Plaintiff's surgery was June 18, 2010, and her wound was completely healed by September 15, 2010. (Tr. 481.)

Dr. Bhattacharya did state that plaintiff required a cane for distances greater than 100 feet and for uneven terrain, but, importantly, he stated that plaintiff required a cane to walk, not that she could not walk. Plaintiff correctly cites Listing 1.00B2b(1) describing inability to walk effectively, which requires "insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning *of both upper extremities* . . . ." (emphasis added.) Listing 1.00B2b(2) includes examples such as use of a walker, *two* crutches or *two* canes, or the inability to walk a block on rough or uneven surfaces.

Dr. Bhattacharya's report states that plaintiff requires a cane, not that she cannot walk. Therefore, his report clearly does not support plaintiff's contentions.

Notably, most of plaintiff's prior employment positions were terminated not because of her physical limitations, but because of mental or emotional problems. (Tr. 38-42.)

Plaintiff argues that her continued use of a cane is evidence that she would not recover from her surgery in a 12-month period. However, Listing 1.03 requires only that plaintiff recover to the point of effective walking, not to complete health. As stated above, plaintiff's surgical wound healed within three months of the surgery.

The ALJ was correct to require accommodations for plaintiff, but her decision that plaintiff is not disabled is supported by substantial evidence.

## B. Impairments in the Aggregate

Plaintiff argues that the ALJ failed to consider her severe medically determinable impairments in combination, citing Cunningham v. Apfel, 222 F.3d 496 (8th Cir. 2000), and that this failure requires remand "because even moderate limitations in any area of functioning support a finding that the medical impairment is severe." (Doc. 15 at 14.) The ALJ's failure to properly evaluate plaintiff's knee pain and asthma, it is argued, removed their impact on the ALJ's RFC determination. The undersigned disagrees.

When stating the applicable law, the ALJ's opinion describes the requirement that Steps 2 and 3 include consideration of plaintiff's impairments singularly and in combination. (Tr. 12.) Applying the law, the ALJ then found that plaintiff did not have "an impairment or combination of impairments that meets or medically equals one of the listed impairments" in the Commissioner's Listing of disabling impairments. (Tr. 15.) Further, the ALJ considered all X-rays, MRIs, and expert testimony, most of which

was accepted, though the opinion notes, "Regarding her alleged fibromyalgia, tendonitis, plantar fasciitis, osteoarthritis, and scoliosis, only fibromyalgia and osteoarthritis/degenerative joint disease were specifically included in diagnoses." (Tr. 17.)

The ALJ found that plaintiff's physical symptoms, to the extent plaintiff claims them, lack support in the record. The ALJ stated that "despite her allegations of significant pain and impairment of function, the medical treatment notes do not reflect any physical basis for such complaints." (Id.)

Plaintiff claims that the ALJ failed to acknowledge the severity of her knee pain. The undersigned disagrees. The ALJ specifically found that plaintiff's subjective complaints were not entirely credible. This assessment was applicable to the ALJ's survey of plaintiff's "musculoskeletal/joint impairments." When considering this part of plaintiff's physical system, the ALJ specifically referred to the normal X-rays of plaintiff's hand and knee in 2009 and the 2010 MRI of her right knee which indicated "moderate joint effusion." (Tr. 17.) Thus, the ALJ considered plaintiff's allegation of knee pain in the RFC determination

If the ALJ finds *any* severe impairments, the ALJ must continue the sequential analysis and address the limiting effect of all claimant's impairments in the RFC determination. 20 C.F.R. § 404.1545. If the ALJ considers the alleged impairment in the RFC determination, the failure to find the impairment severe is harmless error. Swartz v. Barnhart, 188 F. App'x 361, 368 (6th Cir. 2006); see also Dewey v. Astrue, 509 F.3d 447, 449-50 (8th Cir. 2007); Van Vickle v. Astrue, 539 F.3d 825, 830-31 (8th Cir. 2008). Because the ALJ considered plaintiff's knee pain in her RFC determination, her failure to label it as "severe" in Step Two is harmless.

Plaintiff also claims that the ALJ failed to find limitations for her severe impairment of asthma, arguing that the finding of a severe impairment requires a finding that it limits one's ability to work. The ALJ decided that plaintiff's asthma was severe, but not so severe as to prevent her from work. The ALJ noted that her asthma did not preclude her from being cleared for surgery, and furthermore that Dr. Shereen would not have recommended exercise if her asthma would pose a danger. (Tr. 17-18.) This determination does not mean, however, that the ALJ found that plaintiff was not limited by her asthma. She limited plaintiff to sedentary work.

The fact that the ALJ considered plaintiff's asthma and knee pain in the RFC determination is controlling. Therefore, if the ALJ erred in finding that plaintiff's limitations do not include the requirements of Listings 1.02 or 1.03, such error is harmless.

The ALJ recognized plaintiff's impairments in combination, and limited plaintiff to sedentary work with a sit/stand option. The opinion considered outside factors such as age, education, and work experience. The vocational expert testified that considering these factors, plaintiff would be able to perform the work of pharmaceutical ampoule sealer, document imaging preparer, or assembly work, with thousands of these jobs available in Missouri. (Tr. 62-63.)

The ALJ addressed all the components of plaintiff's claim, and either accepted or dismissed them based on the medical evidence in the record. The ALJ's decision denying benefits is supported by substantial evidence.

## VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

/S/ David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on December 27, 2012.